## Staunton.

### E. M. POWERS V. COTELLA LONG AND SCOTT POWERS, JR.

September 22, 1921.

Absent, Prentis and Burks, JJ.

1. TRUSTS AND TRUSTEES—*Parol Declaration of Trust—Evidence.*— A parol declaration of trust must be unequivocal and explicit and established by clear and convincing testimony.

2. TRUSTS AND TRUSTEES—*Parol Declaration of Trust—Evidence— Case at Bar.*—In a suit to establish a parol trust in land conveyed by a father to one of his sons, though a number of witnesses were examined, there was no evidence of a declaration of trust having been made at the time of or prior to the conveyance, except that of the father, consisting of vague general statements contained in his deposition taken twenty years after the conveyance, and there was evidence from which it might be inferred that no declaration was made by the father creating any trust until after the deed was delivered to the son.

*Held:* That the evidence was not sufficient to establish the trust.

Appeal from a decree of the Circuit Court of Dickenson county. Decree for complainant. Defendant assigns error.

*Reversed.*

W. S. Powers, the father of the appellant and appellee, on May 11, 1898, executed and acknowledged a deed conveying three certain tracts of land therein described to appellant. This deed was duly recorded on September 26, 1900, and is as follows:

"This deed, made this eleventh day of May, 1898, by and between W. S. Powers, party of the first part, and E. M. Powers, party of the second part.

"Witnesseth, that for and *in consideration of the sum of*

*four hundred and fifty dollars in hand paid, the receipt of which is hereby acknowledged,* the party of the first part has this day *bargained and sold* to the party of the second part all the following described real estate lying and being in Dickenson county, Virginia: One tract on the waters of Sally branch, containing one hundred and fifty acres, more or less, and joins the lands of A. J. Mullins, Louisa Kennedy and others; one tract on Alley's creek, containing fifty acres, more or less, joining the lands of Ida Kennedy and others; one tract on Cranes Nest river, containing twenty-five acres, more or less, *sold* by the boundary, and not by the acre, joins the lands of *Mveliad* Mullins and others, to have and to hold forever. Party of the first part *warrant the title generally* to the land hereby conveyed.

"Given under my hand and seal this above date written.
                              "W. S. Powers.    (Seal.)"
(Italics supplied.)

The bill in the cause alleges that "the said conveyance to the said E. M. Powers was impressed with a direct express (parol) trust and agreement between the said E. M. Powers, the grantee, and W. S. Powers, the grantor, that the said E. M. Powers would hold the land conveyed until the children of the said W. S. Powers became twenty-one years old, and then, in furtherance of the said trust the said E. M. Powers was to convey the said land to the children of the said W. S. Powers by deed of general warranty when they should reach the age of twenty-one years. The portion each was to receive being ascertained and understood by said trust agreement."

The bill then alleges that when the appellees became twenty-one years of age, appellant, in pursuance of said trust, conveyed to them a portion of the land to which they were entitled and, without stating the definite acreage or other-

wise describing the alleged deficit, the bill prayed that the appellant may be required to convey to the appellees the remainder of the land to which they were entitled under the said parol trust, and for general relief.

The answer of the appellant, E. M. Powers, denies that he accepted said conveyance upon any trust agreement, promise or understanding, express or implied, to the effect that "he was afterwards to convey the same to complainants or anyone else." The answer thereupon alleges that on the contrary said grantor "conveyed this land to respondent voluntarily and for the purpose of hindering, delaying and defrauding his creditors; that no consideration deemed valuable in law, passed from respondent to the grantor for said conveyance, before or at the time the same was made, but that several years thereafter respondent did pay to said W. S. Powers, his grantor, full and adequate value for the part of said land now owned by him, which respondent had surveyed off to himself, which amounted to fifteen and ninety-one-hundredths acres;" that the conveyance respondent made to appellees was made at the request of said W. S. Powers; that respondent was under no legal obligation to make such conveyance, but did so "out of respect to the wishes of his father and the like respect for the moral rights of his brother and sister to share in the property of their father * * *."

Although there were a number of persons who were members of the family, and intimate associates of the grantor, examined as witnesses, there is absolutely no evidence in the case of any declaration of trust having been made by the grantor to any one at the time of or before the aforesaid conveyance, except the testimony of the grantor which appears from his deposition filed in the cause in behalf of appellees, which was taken twenty years after the conveyance was made; and that testimony consists of the following vague general statements on cross-examination:

"A. I suppose the whole three hundred twenty-one acres" (the three tracts conveyed by the deed which in fact contained more land than the quantities mentioned in the deed), "was deeded to him (E. M. Powers) with the understanding that he was to make certain conveyances according to our agreements.   *   *   *

"Q. Isn't it a fact that E. M. Powers didn't know that you had made this conveyance to him, I mean the deed of 1898, for a long time after the deed was made and recorded?

"A. Of course he knew the contract before the deed was ever made and I never claimed any of the property since 1898.

"Q. Isn't it a fact that you never mentioned this fact to E. M. Powers until a long time after the deed was made?

"A. No sir.

"Q. Please give the time and place where you had a conversation or contract with E. M. Powers what he was to do with this land or about you going to convey it to him?

"A. I don't remember.  It was somewhere in Virginia. The time was some time prior to the deed."

The father had five children, E. M. Powers, the appellant; Mrs. Susie Dotson, Mrs. Maggie Kennedy and the appellees, Mrs. Cotella Long and Scott Powers, Jr., who were living at the time of the deed in 1898 and, so far as appears, were also living at the time this suit was brought and when the depositions were taken.  None of them testified in the case except E. M. Powers, and Scott Powers, Jr.

Scott Powers, Jr. was examined as a witness in behalf of the appellees and testified in substance that he knew of the sale by his father of the ten acres of land, covered by the writing presently to be mentioned, to E. M. Powers, made some nine or ten years after 1898, and of the agreement between them on the boundaries of such land, of which the witness gives a description.

Walter Kennedy, the husband of Mrs. Kennedy, was examined as a witness for the appellees and testified to the effect that about nine or ten years after the deed of 1908, he was present when the said father and the appellee, E. M. Powers, "were talking of trading" for ten acres of the fifteen and ninety-one hundredths acres aforesaid, and that E. M. Powers had lived on this ten-acre piece of land ever since; and that the witness "had never heard him (E. M. Powers) say anything about being a trustee, except, when I took my wife's deed to him he said he couldn't sign the deed unless I had an order from his father, or he was present I believe." This witness' testimony is also to the effect that there was no designation by the father of the parcel of land Mrs. Kennedy was to get until the year 1904, when he "showed her what part of the land she could have" and that they built there about a year before it was surveyed, and that the boundaries of it were not fixed until it was surveyed, a month or two before Mrs. Kennedy got her deed in 1905.

R. A. Long, the husband of the appellee, Mrs. Long, was a witness in the case for appellees, and his testimony is to the effect that when the appellant, E. M. Powers, executed the aforesaid deed to Mrs. E. M. Long, Powers said "that he was to deed this land as Scott" (his father, W. S. Powers) "wanted it deeded or when he wanted it deeded to the children, words to that effect."

R. A. Long filed with his deposition a copy of the following writing which he says he saw in the possession of appellant, E. M. Powers, in the original of which however the "fifteen" before the word "acres" had been plainly written over an erasure of the word "ten." Long's testimony is to the effect that otherwise this appeared to be a genuine writing signed by the said father, W. S. Powers, as of the date thereon of July 8, 1907. This writing, as it appears in the record, is as follows:

"I have this day bargained and sold to E. M. Powers fif-

teen acres of land on the waters of Alley's creek, in Buchanan county, Virginia, at the price of twenty dollars ($20.00) per acre, including storehouse, balance to be paid hereafter.  This July 8, 1907.

(Signed)       "W. S. Powers."

In the testimony of the father as to the trust, he first states on examination in chief, that,—

"I divide it" (the three tracts of land conveyed by the deed of 1898) "and deeded a portion to W. R. Keel and another portion of it to Susie Dotson, my daughter, and another portion of it to Maggie Kennedy, another one of my daughters; and then I deeded the remainder to E. M. Powers with the understanding that he was to deed all the remaining part to Cotella Long and Scottie Powers" (the appellees), "except ten acres, including his" (E. M. Powers) house.

"Q. Did you give to E. M. Powers any writing for this ten acres?

"A. Yes sir, I think I did, showing what he was to have.

"Q. Now do you remember the number of acres that the following deeds contained, namely, to W. R. Keel, Maggie Kennedy, Susie Dotson and the bond to E. M. Powers?

"A. I do not remember the amounts in any of the deeds except Maggie Kennedy's, which was fifty-nine (59) acres, and the amount of the title bond was ten (10) acres, as I remember."

Then immediately in sequence in the deposition occurs the following questions and answers:

"Q. Then if I understand you correctly, you had made this division of your land before you conveyed it to E. M. Powers as trustee in the year 1898 and that since that time he has executed conveyances to all the parties named except the complainants in this suit?

"A. My recollection is that he made these deeds and I

joined in as a release, yes, certainly, the division had been made and each boundary had been allotted to them and the lines drawn at the time of the execution of the deed of 1898.

"Q. Do you know about the date of the title bond that you executed to E. M. Powers for the acres including the storehouse?

"I don't remember.

"Q. Was this title bond to E. M. Powers for the ten acres after the year 1898?

"A. I don't remember whether it was or not."

This is all of this witness' testimony on examination in chief, except the answers to the usual formal introductory questions to a witness. A portion of his testimony on cross-examination has been given above. The following additional excerpts from and references to his testimony on cross-examination and re-examination will be given:

The sole explanation this witness gives as the reason for his making the deed of 1898 appears from the following question and answer on his cross-examination:

"Q. Why did you deed all your real estate to E. M. Powers?

"A. One reason was at the time I was in bad health and did not know what was going to happen."

This witness admits, in substance, that a brother of his, Willie Powers, and himself had been engaged in the mercantile business under the firm name of Powers Brothers, prior to 1898, and that at the time the deed of 1898 aforesaid was executed this firm had failed in business. He denies that he was heavily indebted at that time, and states that "I owed a few debts at that time but they were very small, I paid a hundred cents on every dollar I owed."

There is no evidence in the cause showing the amount of the indebtedness of this witness or of the firm of Powers Brothers at that time; but it is an uncontroverted fact shown in evidence (without any objection to the testimony

on the part of appellees on the ground that the answer of appellant was not sufficiently specific in its allegations to permit such proof to be introduced), that at or about the same time the said deed of 1898 was made by W. S. Powers, the partners of Powers Brothers made a deed to the same E. M. Powers and the wife of Willie Powers, which was in fact fraudulent as to the creditors of the grantors, conveying to them a 200 acre tract of land, which was all the real estate owned by the firm, which was afterwards conveyed by the grantees in accordance with the request of W. S. Powers.

It is an uncontroverted fact shown in evidence that there was no consideration for either of these deeds at the time they were made.

The witness, W. S. Powers, admits that he and E. M. Powers agreed on the boundaries supposed to contain the ten acres of land which he sold the latter and that he then put E. M. Powers into possession of it.

The preponderance of the other evidence in the case clearly shows that E. M. Powers paid his father in full for the ten acres of land as early as 1907 or 1908, and that the son then had the land surveyed practically according to the boundaries agreed on between himself and his father and it surveyed out approximately ten acres, which the son fenced in and took possession of. That before that time or subsequently the father became indebted to this son in the further sum of about $100.00 and the son without any express authority from the father had the same surveyor who made the former survey, survey off an additional quantity of land which surveyed out five and ninety-one-hundredths acres, approximately which the son claimed the right to hold in satisfaction of such $100.00 indebtedness, and was extending his fences so as to enclose it when this suit was instituted.

W. S. Powers admits on re-cross examination, that he never marked out any of the boundary lines of the land

which was conveyed to Mrs. Kennedy, as aforesaid, before "it was surveyed at the time the deed was made or about the time the deed was made."

The tract of land first mentioned in the deed of 1898 as containing 150 acres, in fact contained, as it would seem from the evidence, about 174.65 acres. It appears from the uncontroverted evidence in the case that this was the only tract which the father at any time intended his children to have. That, of the residue of the land conveyed by such 1898 deed, the father, after 1898, sold a portion to the son, E. M. Powers, who paid him for it in full and afterwards held and conveyed it away as undisputed owner. That either before or after 1898 the father sold the balance of said residue of land to one W. R. Kell, and that after 1898 it was conveyed by E. M. Powers to a vendee of W. R. Keil.

The record is not very explicit on the subject, but the preponderance of the evidence indicates that if the 150 acre tract as described in the 1898 deed contained 174.65 acres, it was, after 1898, disposed of by the son E. M. Powers as follows: He conveyed, at the request of the father made at the time the respective deeds were made, all after 1898—

| | |
|---|---|
| To Mrs. Dotson ........................... | 39 acres |
| To Mrs. Kennedy ......................... | 59.75 |
| To Mrs. Long ............................. | 59.99 |
| The son himself retaining ............... | 15.91 |
| | 174.65 |

The appellant, E. M. Powers, testified that he was away from home when the deed to him of 1898 was made; that he did not know it had been made until some years afterwards. That nothing was said to him by his father on the subject of this deed prior to the execution and recordation of it. That he thereafter executed the deeds, as and when

requested by his father, conveying all of the land away as aforesaid, except that which was bought by himself and paid for as aforesaid, and the five and ninety-one-hundredths acres which he considered that he had the right to hold in satisfaction of his $100.00 debt aforesaid. He first denies, but subsequently practically admits that he altered the writing given him as a title bond by his father for the ten acres of land therein mentioned, making it read "fifteen" acres instead of "ten" acres, because he claimed that his father had written him a letter about the year 1915 to have the land he had paid for surveyed off and to convey the balance to the appellees, and he construed this to authorize him to have the additional five and ninety-one-hundredths acres surveyed off, as he did, as above stated, although he admitted that the matter of his buying this additional five and ninety-one-hundredths acres of land from his father had never been expressly mentioned between them, and that, accurately speaking, his father had never authorized him to do this. The letter referred to was not introduced in evidence.

The wife of E. M. Powers testified as a witness for appellant and stated that W. S. Powers told her that he made the deed of 1898 to E. M. Powers because he (W. S. Powers) was in debt and in order to keep the land conveyed thereby from being sold for his debts. She said this statement was made to her about a year before the date of her testimony. (No objection was made to this testimony by appellees on the ground that the answer was not sufficiently specific in its allegations to permit its introduction.)

John Perrigan, who married a step-daughter of W. S. Powers, was examined as a witness for appellant, and testified to the effect (without objection being made to the testimony as hearsay), that the general understanding in the family of W. S. Powers was that the deed of 1898 to appellant was made by W. S. Powers to keep the land from

being sold by his creditors and that it was the opinion of the children "that they would get the land or their propor-. tionate part of the land." That he never heard the children say it in that way exactly, and that he didn't know that he "ever heard them say in what way or who would make the deed;" but that was "the sort of opinion," and that he never "heard E. M. Powers or W. S. Powers" that he could remember, "say anything binding either way." He does not testify when this "opinion" arose.

The court below, by the decree which is under review, held that the appellant was entitled to hold the ten acres of land sold to him by W. S. Powers, being a part of the tract of land which is first mentioned in the aforesaid deed of 1898 from W. S. Powers to appellant, but required the latter to convey to the appellees the unconveyed portion of such tract of land, which embraces the five and ninety-one-hundredths acres of the fifteen and ninety-one-hundredths acres of land in controversy, as aforesaid. This action of the court is by the appellant assigned before us as error. The appellees assign as cross-error the action of the court in holding that the appellant is entitled to hold the ten acres of land just mentioned.

*Chase & McCoy* and *D. F. Kennedy,* for the appellant.

*S. H. & Geo. C. Sutherland,* for the appellees.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The whole case for the appellees turns upon the following question:

1. Is the parol declaration of trust relied upon by appellees in this case shown to "be unequivocal and explicit and established by clear and convincing testimony?"

The question must be answered in the negative.

That the standard of proof required to establish a parol trust in real estate is that stated in the question is well settled. *Fleener* v. *Hensley,* 121 Va. 367, 93 S. E. 582; *Taylor* v. *Delaney,* 118 Va. 203, 86 S. E. 831.

In the case before us the proof is neither clear nor convincing that there was any declaration of trust at the time of or prior to the execution and delivery of the deed of 1898 from W. S. Powers, the father, to his son, the appellant. The evidence it is true, very clearly shows that there was no consideration at the time for the deed of 1898 and that the father some nine or ten years after 1898 decided to sell a portion of the land claimed by appellees to appellant and to give the residue of the tract, which is especially drawn in question in this suit, to the other children; but the preponderance of the evidence, as we think, establishes that the father did not himself decide to make these gifts until long after 1898, to-wit, shortly before or at the times the appellant made the respective deeds of land to the other children, in accordance with the requests of the father made from time to time after 1898 that he should do so.

The only reason given by the father in his testimony for the making of the deed of 1898 in question is stated in his testimony as follows:

"One reason was at the time I was in bad health and did not know what was going to happen."

This statement, along with the absence of any testimony, even of the father, of any "unequivocal and explicit" declaration of trust until after 1898, and the total absence of any other evidence from any other source of any declaration of trust whatsoever having been made by the father until long after 1898, convinces us that the father made no declaration creating any trust until after the deed of 1898 was delivered and had vested in the appellant the absolute title to all of the land thereby con-

veyed. It is unnecessary for us to decide whether the prime motive for the making of the conveyance by the father was to shield the land from the chance of its being sold to pay his debts; for, whether that is true or not, the testimony, even of the maker of the deed, does not go any further than to show that he made a voluntary conveyance to the son of all the land he then owned, (three tracts, containing some 321 acres), because he (the grantor) "was in bad health and did not know what was going to happen," depending upon the son to afterwards "make certain conveyances according to our agreements," without stating explicitly or unequivocally what those agreements (or "contracts" as he calls them in another place) were; with his own statement excepting, as of 1898, ten acres from the alleged trust, which the evidence in the case clearly shows was not mentioned between him and the son until nine or ten years afterwards; with his first statement showing that there was no actual decision made by the donor to give any of the land to the children until the deeds were made to them, which were made after 1898; with his subsequent statement, made in answer to a leading question, to the effect that the division was made in 1898, left in a most general, vague, and unexplicit form, contradicted in part by his own subsequent statements, and wholly contradicted by the other evidence in the case showing that no division or designation of boundaries of the land given to the children was ever made until long after 1898. This evidence in effect shows, as we think, that there was in truth no gift to these children until the deeds to them were made, long after 1898, as aforesaid. Such gifts were, of course, necessarily subject to the absolute conveyance which had been made to the appellant in 1898 and dependent for their going into effect upon the assent of the appellant thereto and his voluntary execution of conveyances putting the same into effect.

Other circumstances shown in the statement preceding this opinion tend strongly to confirm the conclusion just stated, but it is unnecessary to recapitulate them here. What has been said is sufficient to show our reasons for holding, as we do, that the proof in the cause fails to establish the parol trust sought to be set up by the bill of the appellees in this cause.

It follows that there is no merit in the cross assignment of error of appellees, with respect to the provisions of the decree under review, holding that the appellant is entitled to hold the ten acres of land therein mentioned; but, as there is error in the decree in so far as it holds that the appellant should make any further conveyance of land to the appellees, we will enter our decree reversing the decree under review in that particular, and dismissing the bill, at the costs of the appellees.

*Reversed and dismissed.*